STATE OF NEBRASKA, APPELLEE, V.
STEVEN M. LOVELESS, APPELLANT.

308 N.W.2d 842

Filed July 31, 1981. No. 43852.

Joseph L. Vacca, Esquire, for appellant.

Paul L. Douglas, Attorney General, and Sharon M. Lindgren for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ., and COLWELL, Retired District Judge.

PER CURIAM.

Steven M. Loveless, the defendant and appellant herein, appeals to this court from his conviction in the District Court of Washington County, Nebraska, of the crime of possession of burglary tools in violation of Neb. Rev. Stat. § 28-508 (Reissue 1979). The case was tried before a jury commencing on September 15, 1980. The

jury found the defendant guilty of the charge. On October 20, 1980, Loveless appeared before the District Court for trial on count II of the information, which charged him with being a habitual criminal. The defendant was found not guilty on that charge, and the habitual criminal charge was dismissed. On November 3, 1980, the trial court sentenced Loveless to a term of imprisonment for 1 year in the Nebraska Penal and Correctional Complex, less credit for 9 days spent in the Washington County jail while awaiting disposition of this case. We affirm.

The background against which this case arises involves two incidents and trips made by the defendant Loveless and two acquaintances of his, Herschell Gitchell and Martin Kulakofsky, who allegedly drove to Blair, Nebraska, from Missouri Valley, Iowa. The first visit occurred during the evening hours of Saturday, January 12, and the early morning hours of Sunday, January 13, 1980; and the second visit occurred during the evening hours of Sunday, January 13, 1980, and the early morning hours of Monday, January 14, 1980. This appeal involves only the defendant, Steven Loveless, who was charged and convicted of the offense of possession of burglary tools, as stated above. Although, in his brief on appeal, the defendant makes four separate assignments of error, the principal contentions involved herein are that the court erred in allowing, over defendant's objections, a certain tape recording to be played to the jury when the recording was inaudible in portions and difficult to understand, and also that the court erred in allowing a witness, Officer Warden, to testify as to his interpretation of certain portions of the tape in question. The record reveals that during the trial of the defendant, the jury was allowed to hear the aforesaid tape recording of an alleged conversation between Kulakofsky and Gitchell, which was introduced by the State apparently for the purpose of establishing the presence of Loveless in Blair, Nebraska, during the evening of January 12, 1980, and the early morning

hours of January 13, 1980. In addition to the tape recording itself, a typed transcript of the tape was received in evidence for the jury's consideration.

Without setting out in detail at this point the facts leading up to the visit of the three men to Blair on the evening of January 12, 1980, it appears that at approximately 3 a.m. on the morning of January 13, 1980, Kulakofsky and Gitchell were detained by members of the Blair Police Department at a location outside of Blair, Nebraska, on Highway 30. They were suspected by the police of possible criminal activity, and were placed in the back seat of a police cruiser and left alone, during which time the police conducted an on-the-site investigation. At the time Officer Warden of the Blair Police Department left Kulakofsky and Gitchell alone in the police cruiser, he had left a microcassette tape recorder operating on the front seat of the cruiser. It was this cassette which recorded the conversation between Kulakofsky and Gitchell, and which was offered and received in evidence at the trial. Later that morning, Kulakofsky and Gitchell were released by the police and left Blair to return to Iowa where they allegedly found Loveless walking on the Iowa side of the Missouri River bridge. The record further reveals that in the evening of that same day, January 13, 1980, Gitchell went to the defendant's home in Missouri Valley, Iowa, and requested a ride to Blair for the purpose of retrieving a screwdriver and crowbar which he had abandoned in a ditch along Highway 30 at the time he was originally detained by the police. Loveless then drove Gitchell to the spot along Highway 30, and they retrieved the tools from the ditch. Gitchell placed the tools on the floorboard in front of the passenger seat in Loveless' car and commenced to leave, but they were stopped by the Blair police and subsequently arrested for possession of burglary tools.

The testimony given by the three men at the trial was widely divergent and, in spots, very contradictory. Loveless testified at the trial that he had accompanied

Kulakofsky and Gitchell to Blair on the first night; that they had gone to a bar outside of Blair; and that a disagreement arose, following which he left the bar and commenced walking back to Missouri Valley, Iowa. He stated he did not see Kulakofsky or Gitchell again until several hours later, when they picked him up in Iowa.

Kulakofsky testified, however, that during the evening of January 12, 1980, he and Gitchell had driven from Council Bluffs to Loveless' home in Missouri Valley, Iowa, and that while at the Loveless home the three men discussed plans to go to Blair that evening and bulgarize either the Pizza Hut or a bowling alley. For the purpose of effecting an entry to the place of business, they took with them a crowbar and a screwdriver, which were later identified by a witness as falling within the category of "burglary tools." They also took with them two walkie-talkies to use for communication purposes during the commission of the burglary. The three men drove to Blair in Gitchell's car, and had the burglary tools and walkie-talkies with them inside the car. According to Kulakofsky, when they arrived in Blair they drove past the bowling alley and Pizza Hut and went to the Plum Tree Lounge. The three men later left the lounge, and Kulakofsky drove the car to a dirt road and let Gitchell and Loveless out of the car with the crowbar and screwdriver and one of the walkie-talkies. According to the plan formulated earlier that evening in Loveless' home in Missouri Valley, Kulakofsky was to act as the "look-out" man and was to remain in the car until the others communicated with him on the walkie-talkie with directions to pick them up. Kulakofsky testified that he became concerned when his walkie-talkie did not work, and after a period of time he began driving up and down the highway looking for his companions. He was stopped by Officer Warden and ticketed for failure to have a registration for the car. He subsequently located Gitchell who had also been stopped by the police; and, as previously stated, they were both placed in the police cruiser where

their conversation was recorded. They were later released and were driving back to Iowa when they allegedly located the defendant on the Iowa side of the bridge. Subsequent to picking up the defendant, there was conversation in the automobile about Gitchell and Loveless returning to Blair the next evening to retrieve the crowbar and screwdriver which had been deposited in the ditch. Kulakofsky denied there was any argument between the men while they were at the Plum Tree Lounge.

Gitchell testified at the trial that he had deposited the crowbar and screwdriver in the ditch when he saw the police; that he had intended to burglarize the Pizza Hut on either night if the conditions were favorable; and that he intended to use the crowbar and screwdriver for that purpose. Police Officer Hale of the Blair Police Department identified an exhibit as being part of a "lockhouse" which he removed from the Pizza Hut door on January 14, 1980, after the defendant had been arrested. Esley Kotschwar, firearms and tool mark examiner of the Nebraska State Patrol, testified he had examined the crowbar and the lockhouse from the Pizza Hut and expressed the opinion that the crowbar admitted into evidence was used to make the tool marks on the door latch plate.

The State offered into evidence at the trial a tape recording of the conversation between Gitchell and Kulakofsky in the rear seat of the police cruiser, for the apparent purpose of rebutting defendant Loveless' testimony that he had been walking home to Iowa at the time his companions were detained and had no intention of burglarizing businesses in Blair. The trial court held hearings on two motions to suppress the tape, which motions were overruled. At the trial the tape was admitted into evidence as exhibit 14 and played to the jury, and a transcript of the tape, prepared by Officer Warden who had listened to the tape over 50 times, was also received into evidence and submitted to the jury. Although certain portions of the tape were inaudible, as

evidenced by the notations of the court reporter, it appears that other portions of the tape were audible, and were even transcribed by the court reporter who heard them played in the courtroom. Of particular importance is the conversation between Kulakofsky and Gitchell while talking in the back seat of the police cruiser, with the tape recorder sitting on the front seat. Both the tape and the written transcript prepared by Officer Warden reveal that Kulakofsky asked Gitchell, "Where'd Steve go?" and Gitchell replied, "Down in the hole down there," to which response Kulakofsky stated, "Okay that's cool." Also, according to Officer Warden's transcript, at that time Kulakofsky asked Gitchell, "Where's the bars?" and Gitchell replied, "Steve's got 'em." The tape and transcript would seem to indicate, as reflected above, that Loveless may not have been walking home to Iowa as he claimed in his testimony.

Officer Warden testified that exhibit 15 was a transcript he made of the tape in question on January 14, and also testified: "I've used this type of tape recording for the past two years and I've transcribed a number of tapes that I've recorded in certain cases, including this tape here, particular tape, I've transcribed, written it out. I have listened to this tape probably 50 times." The court then stated, "Well, with that basis, I'll let you proceed and you'll have the right to bring in anything else that you want to."

The defendant contends on appeal that Officer Warden was not an expert in the field of making or transcribing sound recordings and, therefore, his testimony, particularly with regard to the interpretation of certain portions of the tape in question, should have been excluded. We point out, however, notwithstanding the lack of formal training in connection with the preparation and interpretation of sound recordings, that to be considered an expert it is not necessary that one have such formal training; actual practical experience in the field can also qualify one as an expert in that field. This fact is recognized by the new evidence

rules adopted in this state. Neb. Rev. Stat. § 27-702 (Reissue 1979) provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, *a witness qualified as an expert by knowledge, skill, experience, training, or education*, may testify thereto in the form of an opinion or otherwise." (Emphasis supplied.)

It is a well-established rule of law that tape recordings of relevant and material conversations are admissible as evidence of such conversations and in corroboration of oral testimony of the conversations, provided proper foundation is laid. *State v. Myers*, 190 Neb. 146, 206 N.W.2d 851 (1973); *State v. Lynch*, 196 Neb. 372, 243 N.W.2d 62 (1976). In 29 Am. Jur. 2d *Evidence* § 436 (1967), it is stated: "The fact that a recording may not reproduce an entire conversation, or may be indistinct or inaudible in part, has usually been held not to require its exclusion; however, the recording may be rejected if it is so inaudible and indistinct that the jury must speculate as to what was said. It has been held that unless the unintelligible portions of a tape recording are so substantial as to render the recording as a whole untrustworthy, the recording is admissible and the decision whether to admit it should be left to the sound discretion of the trial judge." We are unable to determine from the record in this case exactly how much of the tape recording in question was inaudible, but it is clear that certain material parts were audible and were recorded by the court reporter on the playback of the tapes in the courtroom, both at the hearings on the motions to quash and during the trial itself. There is nothing in the record to indicate that the trial court in any way abused its discretion in refusing to suppress the evidence in question and in admitting the tape into evidence at the trial, particularly in view of the testimony of Officer Warden that he had had considerable experience in tape recording conversations and had, in fact, studied and replayed this particular tape at least

50 times.

Defendant contends, however, that it was not proper for Warden to testify and explain his interpretation and conclusions as to certain portions of the tape in which the words were, at least to a certain extent, inaudible and unclear. There is no question, and there are a legion of cases so holding, that one who was present and who heard the conversation in question at the time the recording was made may testify for the purpose of clarifying inaudible or unintelligible portions of the tape. However, as the defendant in this case points out, Officer Warden was not present at the time the conversation between Gitchell and Kulakofsky occurred in the rear seat of the police cruiser, and hence defendant contends Warden should not be permitted to testify as to the contents of the tape recording in question. This same question was addressed in the case of *United States v. Onori*, 535 F.2d 938 (5th Cir. 1976). In that case the court permitted the testimony of an expert in tape identification to point out alleged errors in the government's transcript of the conversation in question. The court also in its opinion pointed out the reasons for the necessity of the use of a transcript of a tape recording, stating: "The need or desire for transcripts arises generally from two circumstances. First, portions of a tape may be relatively inaudible. Second, without the aid of a transcript, it may be difficult to identify the speakers. In either of these cases, it has been said that it is within the discretion of the trial court to allow a transcript to be used by the jury *'to assist the jury as it listens to the tape.'* . . .

. . . .

"It is therefore incorrect to think of the transcripts as simply an 'aid' — as better lighting fixtures in the courtroom would be an 'aid' to the jury's vision of witnesses — and not as evidence of any kind. They are evidence and, like other evidence, may be admitted for a limited purpose only. That purpose here, as the court outlined in its special instruction, was primarily to establish the

identity of the speakers at any particular time." *Id.* at 947.

Since it is permissible for experts to testify with regard to the contents of sound recordings, and since we have concluded that, notwithstanding his lack of formal training in the field, Officer Warden, by virtue of his experience, was in fact an expert, we conclude that the trial court, in the exercise of its judicial discretion, did not err in admitting into evidence the tape and the transcript thereof in question, and the same was properly heard and considered by the jury in its deliberations. The weight to be given to the evidence contained in the tape recording and transcript was, we believe, properly a matter for the jury's determination.

We have dealt at some length in this opinion with the question raised by the defendant with reference to the admissibility of the tape recording and the transcript thereof, and of the evidence of Officer Warden at the trial with reference thereto. We are convinced, however, even apart from the question of the admissibility of the tape recording in question, that there is sufficient other evidence in the record to affirm the conviction and sentence of the defendant on the charge of possession of burglar's tools. Section 28-508 defines that crime as follows: "(1) A person commits the offense of possession of burglar's tools if: (a) He knowingly possesses any explosive, tool, instrument, or other article adapted, designed, or commonly used for committing or facilitating the commission of an offense involving forcible entry into premises or theft by a physical taking; and (b) He intends to use the explosive, tool, instrument, or article, *or knows some person intends ultimately to use it,* in the commission of an offense of the nature described in subdivision (1)(a) of this section." (Emphasis supplied.) It is clear that to commit an offense under the above statute it is not required that the burglary or similar offense actually take place.

When instructing the jury in this case, the court in-

cluded in its instructions one on "aiding and abetting." Neb. Rev. Stat. § 28-206 (Reissue 1979) provides: "A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender." This provision contained in the new Criminal Code is substantially similar to Neb. Rev. Stat. § 28-201 (Reissue 1975), upon which instruction NJI 14.12 is based. That instruction was approved by this court at the time of the adoption of the Nebraska Jury Instructions in 1969. The instruction given by the court substantially followed the language of NJI 14.12 and provided, among other things: "Aiding and abetting involves some participation in the criminal act and must be evidenced by some word, act, or deed. No particular acts are necessary; nor is it necessary that any physical part in the commission of the crime is taken or that there was an express agreement therefor. *Mere encouragement or assistance is sufficient.*" (Emphasis supplied.) There is strong evidence in the record from which the jury could conclude that on the evening of January 12, 1980, the defendant and his companions met at the defendant's home in Missouri Valley, Iowa, and at that time agreed to go to Blair, Nebraska, to burglarize the Pizza Hut or a bowling alley; that pursuant to such agreement all three individuals drove to Blair in Gitchell's automobile; that at the time they were driving to Blair for the aforesaid purpose and with the aforesaid intent, they had in the car and in their possession a crowbar and a screwdriver, later established by testimony to be burglar's tools, and also two walkie-talkies; that notwithstanding the conflicting evidence as to who actually owned the tools in question or under whose control the tools were while being transported in the automobile, it is clear that such tools were, during that trip, in the actual or constructive possession of at least one or more of the occupants of the automobile, or in the joint possession of all of them. There is also evidence from which the jury could find that the defendant went to Blair with knowledge of the purpose of the

trip and aided, abetted, assisted, and encouraged the commission of the crime, which, in this case, was charged to be the unlawful possession of burglar's tools. Loveless accompanied Gitchell and Kulakofsky on the trip with obvious knowledge, in view of their previous conversation, that one of them intended to use the tools in question to burglarize a business establishment. It would seem clear that during the trip from Iowa to Nebraska Loveless was in either actual, constructive, or joint possession of the burglary tools with knowledge of their intended use. See, *Phillips v. State*, 154 Neb. 790, 49 N.W.2d 698 (1951); *Kennedy v. State*, 171 Neb. 160, 105 N.W.2d 710 (1960). In *State v. Woodruff*, 205 Neb. 638, 288 N.W.2d 754 (1980), we held that constructive possession may be proved by direct or circumstantial evidence, and may be shown by the accused's proximity to the controlled substance at the time of the arrest or by the showing of ownership, dominion, and right of control of an automobile in which the contraband was found. There is little question but that burglary tools would also fall within the definition of "contraband." See, also, *State v. Matthews*, 205 Neb. 709, 289 N.W.2d 542 (1980). The evidence reveals Gitchell and Kulakofsky drove from Council Bluffs, Iowa, to Missouri Valley, Iowa, in Kulakofsky's automobile; however, in making the trip from Missouri Valley to Blair, Nebraska, they drove over in Gitchell's automobile. The second night the trip was made in Loveless' car. However, in view of the fact that Gitchell was the owner of, and had dominion and control over, his automobile on the way to Blair, Nebraska, on the first night and would therefore, under the circumstances, be guilty of possession of burglar's tools, we believe that Loveless would also be guilty as a principal under the aiding and abetting statute above quoted. In *State v. Walker*, 187 Neb. 482, 191 N.W.2d 817 (1971), we stated that a common purpose among two or more persons to commit a crime need not be shown by positive evidence but may be inferred from the circumstances

surrounding the act and from the defendant's conduct subsequent thereto, and that participation in the criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed. We are of the opinion, therefore, that even considering only the events of the first night in which the defendant and his companions planned the commission of the burglary in Blair and made the trip to Blair in the automobile containing the burglary tools, there was sufficient evidence to sustain the verdict of the jury in convicting the defendant of the crime with which he was charged, even disregarding the issue raised as to the admissibility of the tape recording.

We conclude, therefore, that the judgment and sentence of the trial court were correct and must be affirmed.

AFFIRMED.

WHITE and HASTINGS, JJ., concur in result.

KRIVOSHA, C.J., dissenting.

I must respectfully dissent from the majority in this case. In the first instance, I have some difficulty concluding that the evidence was sufficient to submit the case to the jury on a charge of aiding and abetting the possession of burglar's tools. In my view, the evidence falls short of being sufficient to show the necessary knowledge on the part of the defendant to convict him of aiding and abetting the possession of burglar's tools.

But that is not the basis upon which I find the greatest conflict between myself and the majority in this case. I believe that the tape offered in evidence purporting to consist of a conversation between Kulakofsky and Gitchell was not only inaudible in places but, where audible, was unintelligible insofar as it could in any way be interpreted to concern a conversation about the defendant. The difficulty with the majority's position, as I view it, is twofold. I know of no basis upon which one may be an expert in the unintelligible. To be sure, there are experts with regard to the inaudible. The police

officer in this case did not possess the necessary criteria to be considered an expert in discerning and sifting out inaudible sounds on a tape recording. Rather, he simply supplied the missing terms in order to make understandable what was otherwise an unintelligible sentence.

In *Northern Nat. Gas Co. v. Beech Aircraft Corp.*, 202 Neb. 300, 305-07, 275 N.W.2d 77, 81 (1979), we said: "That rule [§ 27-705], however, does not in and of itself permit anyone to qualify as an expert upon his own declaration or to render any opinion he desires.

"Before an expert opinion can be rendered, it must be shown that such opinion is of a scientific, technical, or other specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact in issue, and that the witness qualifies as such expert by knowledge, skill, experience, training, or education. § 27-702, R.R.S. 1943. There is no exact standard for fixing the qualifications of an expert or skilled witness. Mathine v. Kansas-Nebraska Nat. Gas Co., Inc., 189 Neb. 247, 202 N.W.2d 191. Such a witness will be deemed qualified if and only if he possesses special skill or knowledge respecting the subject matter involved so superior to that of men in general as to make his formation of a judgment a fact of probative value. Kohler v. Ford Motor Co., 187 Neb. 428, 191 N.W.2d 601.

. . . .

"The record is this case is totally devoid of any evidence that an expert in weather would attempt to render an opinion such as that sought to be tendered by appellant's expert herein; or that the information relied upon by the expert was of such type that an expert on weather would rely upon such information in rendering an opinion. In the absence of such evidence we agree with the trial court that any opinion tendered by the expert in this case would be based on pure speculation and be solely without any basis or foundation."

To the same effect, it would appear from the record herein that one does not become an expert on the unin-

telligible simply by having listened to a particular tape over 50 times. The evidence, as I view it, fails to establish that the officer in question had any more ability to understand the tapes than any other lay person. The simple fact of the matter is that the tape was clearly inadmissible and should have been excluded, based upon lack of foundation in addition to the fact that it was plain error to permit its introduction on the basis of hearsay.

The majority has in part resolved this problem by suggesting that the introduction of the tape, even if inadmissible, was harmless error due to the fact that there was sufficient other evidence to convict the accused. I do not believe we can say that the introduction of a tape which is apparently relied upon by the State for the purpose of establishing the credibility of a State's witness where there is a conflict in the evidence can be considered as harmless error. We have no way of looking into the minds of the jury to determine what bit of evidence may have been the deciding factor. Certainly a tape purporting to be a discussion by the witnesses whose testimonies are in conflict is significant.

Though the accused may be guilty, he is nevertheless entitled to a fair trial. I am unable to say that the introduction of the tapes was harmless beyond a reasonable doubt. Being unable to say that, I would have granted a new trial.

I am authorized to state that McCOWN, J., joins in this dissent.