STATE OF NEBRASKA, APPELLEE, V. FERNANDO JIMENEZ, APPELLANT.

530 N.W.2d 257

Filed February 14, 1995.   No. A-94-344.

Michael W. Meister, of Meister & Segrist, for appellant.

Don Stenberg, Attorney General, and David K. Arterburn for appellee.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

MUES, Judge.

Fernando Jimenez appeals his conviction for delivery of marijuana, in violation of Neb. Rev. Stat. § 28-416(1)(a) (Cum. Supp. 1992). Jimenez alleges that he was convicted solely on the uncorroborated testimony of a "cooperating individual," in violation of Neb. Rev. Stat. § 28-1439.01 (Cum. Supp. 1994). In addition, Jimenez argues that the court erred in its instructions to the jury and in failing to uphold objections regarding the prosecutor's conduct during voir dire and responses by a witness to cross-examination at the trial. Because a witness for the State gave an unresponsive answer which injected evidence of Jimenez' silence and his request for an attorney, we must reverse.

## I. STATEMENT OF FACTS

In January 1993, the Gering Police Department made an agreement with Daniel Hubbard in which Hubbard agreed to become a cooperating individual in exchange for a reduction in charges for delivery of marijuana. As part of the agreement, Hubbard informed the Gering police that Jimenez sold marijuana. Hubbard agreed to participate in a controlled buy of marijuana from Jimenez. On January 21, Hubbard met two Gering police officers, who were members of a drug task force, at the task force's headquarters. Investigator Robert Greer searched Hubbard's vehicle after Hubbard arrived and found a marijuana "roach," which Greer described as the burnt end of a marijuana cigarette. Det. Mark Overman searched Hubbard,

during which he patted Hubbard down and asked Hubbard to remove his shirt, shoes, and socks. Overman did not find any drugs or other contraband. Overman counted the money Hubbard had with him and gave him $100 to purchase the marijuana. In addition, Overman equipped Hubbard with a body transmitter.

Hubbard then drove to an apartment building in Gering. Gering police had earlier confirmed that Jimenez' mother was living in an apartment in the building. Greer and Overman followed Hubbard and observed Hubbard park his car and walk to the apartment building. Greer and Overman drove past Hubbard and parked about one block north of the apartment building, where they monitored the transaction through use of Hubbard's body transmitter. Greer and Overman taped Hubbard's activity from the time Hubbard entered the apartment building until Hubbard left after buying marijuana from Jimenez. After Hubbard completed the transaction, Greer and Overman followed Hubbard to a police parking lot. Greer searched Hubbard's vehicle and found nothing. Hubbard gave Overman the marijuana he bought from Jimenez, and Hubbard was then searched by Overman. Overman testified that he found $10 in change from the buy money on Hubbard.

Hubbard testified that he had been to the apartment several times before January 21. Hubbard stated that when he knocked on the apartment door, someone answered and let him in. Hubbard testified that he waited in the living room with Jimenez' brother and mother for about 10 minutes while Jimenez talked on the phone. At trial, the tape recording was played, and Hubbard identified his own voice and those of Jimenez' brother and mother, as well as the sound of a television playing in the background. Hubbard then went into Jimenez' bedroom. At trial, Hubbard again identified his own voice and the voice of Jimenez on a tape recording of the drug transaction in the bedroom which was played in court. On the tape, Hubbard indicates to Jimenez that he has $100 to buy marijuana. Jimenez states that he will let Hubbard have the marijuana for $90. The two talk about the size of the buds on the marijuana and that the marijuana "[s]mells kind of mildewy." Hubbard finishes a beer; leaves the building; gets in a

car; and drives off, telling the police officers who are monitoring the transaction which direction he is headed.

Jimenez was subsequently arrested and charged with delivery of marijuana.

## II. ASSIGNMENTS OF ERROR

Jimenez alleges the district court erred in (1) failing to grant his motion to dismiss, which was based on Jimenez' argument that the cooperating individual's testimony had not been corroborated; (2) failing to give Jimenez' proposed jury instructions; (3) failing to order certain discovery; (4) failing to sustain Jimenez' objection to the prosecutor's remarks during voir dire; and (5) failing to immediately instruct the jury on the law regarding a defendant's right to counsel when a witness testified Jimenez told police he wanted to talk to a lawyer. Because of our conclusion, we will address the first assignment of error last.

## III. STANDARD OF REVIEW

■ All the jury instructions must be read together, and if, taken as a whole, the instructions correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error which would necessitate a reversal. *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994).

■ Not all trial errors, even of a constitutional magnitude, entitle an accused to reversal of an adverse trial result; it is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994).

## IV. ANALYSIS

### 1. JURY INSTRUCTIONS

#### (a) Corroboration Instruction

Jimenez argues that the jury was improperly instructed because the instruction regarding the elements of the charge of delivery of marijuana stated, "The material elements which the State must prove by evidence beyond a reasonable doubt in

order to convict the defendant of the crime charged are . . . ," and the instruction on corroboration of the testimony of a cooperating individual stated, in relevant part, "Corroboration is sufficient if the witness is corroborated as to material facts and circumstances which tend to support the testimony as to the principal fact in issue."

Jimenez argues that when read together the instructions mislead the jury into believing that the testimony of the cooperating individual standing alone is sufficient to convict, because both instructions use the term "material." We are at a loss to understand how this could be the case. The "material elements" language is a standard, classic instruction which tells the jury what the State must prove to sustain a conviction. The "corroboration" instruction, as discussed hereafter, is a correct statement of the law.

Jimenez also complains that the foregoing instruction on the sufficiency of corroboration was an incomplete statement of the law. This instruction is a direct, word-for-word quote regarding the law on sufficiency of corroboration as stated in *State v. Beckner*, 211 Neb. 442, 318 N.W.2d 889 (1982). Citing *State v. Knoefler*, 227 Neb. 410, 418 N.W.2d 217 (1988), Jimenez argues that instead the jury should have been instructed that "[c]orroboration may be supplied by observation that the meeting between the defendant and the cooperating individual actually took place and by searches of the cooperating individual both before and within a reasonable time after the drug purchase took place."

In *Knoefler,* the police attempted to record the drug transaction, but the attempt failed. The *Knoefler* court found that corroboration could be established by a myriad of investigative methods and that corroboration in that case was established by police observations and a search of the cooperating individual. *Knoefler* does not stand for Jimenez' argument that there must be a visual observation by law enforcement officers that a meeting between the cooperating individual and the defendant actually took place in every case in order to provide corroboration.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show

that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994). It is not error for a trial court to refuse to give a defendant's requested instruction where the substance of the requested instruction was covered in the instructions given. *State v. Nelson*, 2 Neb. App. 289, 509 N.W.2d 232 (1993).

Because Jimenez' tendered instruction on corroboration was not a correct statement of the law and the district court's instruction correctly states the law in that regard, there was no error in its instruction to the jury on corroboration.

### (b) Intent Instruction

Jimenez next argues that the instruction regarding intent was incorrect. The instruction given states: "Intent is an element of the crime of distribution or delivery of marijuana. In deciding whether the defendant acted with intent you should consider his words and acts and all the surrounding circumstances." Jimenez argues that the phrase "his words and acts" instructs the jury that Jimenez is the other male speaking on the tape during the transaction and therefore improperly tells the jury what is fact, rather than allowing the jury to find the fact regarding whose voice is on the tape. The intent instruction given is from NJI2d Crim. 5.1. "[S]o long as there is an NJI instruction that accurately states the law and applies to the case, it is the instruction which should be given." *State v. Davis*, 1 Neb. App. 502, 515, 500 N.W.2d 852, 859 (1993). The NJI instruction given on intent in this case is an accurate statement of the law. See *State v. Costanzo*, 227 Neb. 616, 419 N.W.2d 156 (1988).

### (c) Expert Testimony Instruction

Finally, Jimenez alleges that the instruction given to the jury regarding expert testimony was unnecessary and caused the jury to place undue weight upon Overman's testimony regarding drug terms used by Jimenez and Hubbard in the tape recording. Overman testified regarding the meaning of some terms Jimenez and Hubbard used during the transaction. In

relevant part, the jury was instructed: "A witness who has special knowledge, skill, experience, training, or education in a particular area may testify as an expert in that area. You determine what weight, if any, to give to an expert's testimony just as you do with the testimony of any other witness." The instruction is from NJI2d Crim. 5.4 and is a correct statement of the law. See *State v. Schenck*, 222 Neb. 523, 384 N.W.2d 642 (1986). In addition, because the jury was told that only it could determine the weight, if any, to place on an expert's testimony, we are at a loss to understand Jimenez' argument that the instruction placed undue weight on Overman's testimony. We find that Jimenez' assignment of error regarding the jury instructions is wholly without merit.

## 2. DISCOVERY

Jimenez alleges that the district court erred because it did not grant his pretrial discovery request for Overman's personal notes. In his discovery motion, Jimenez requested, among other items, "All personal or business notes, memorandums [sic], and writings prepared by investigators in this case which are not furnished pursuant to any other provisions of this request."

At trial, Overman testified, "[I]n my notes it shows that I turned [the tape recorder] off . . . ," "I recall from my notes that I gave [Hubbard] a hundred dollars total . . . ," and "I've looked through my notes and they don't [reflect how Overman knew Jimenez' mother was his mother]." At trial, Jimenez' attorney did not request Overman's notes upon Overman's testimony regarding those notes.

Jimenez argues that it was an abuse of discretion to deny him the opportunity to review the notes prior to trial, and as a result, he was deprived of a substantial right of effective assistance of counsel and the ability to prepare for trial. The district court noted at the discovery motion hearing that Jimenez would have the opportunity to review any documents used to refresh any witness' recollection at trial, as required by Neb. Rev. Stat. § 27-612 (Reissue 1989). In addition, Jimenez requested and was allowed to depose Overman. The defendant in *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990), made a similar

discovery request for police documents, which was denied, but like Jimenez, had the opportunity to depose the police officers and to request the documents under § 27-612. The *Boppre* court found:

Boppre fails to show how he was prejudiced by the district court's refusal to grant discovery of the three items. He does not claim that he was denied the opportunity at trial to review any documents used to refresh any witness' recollection, and nothing in the record indicates that the State possessed [evidence] that persons other than Boppre had a motive to commit the crimes. Furthermore, Boppre was allowed to depose the three witnesses whose testimony was most prejudicial to him, providing him an opportunity to inquire as to the existence of any prior statements made by those witnesses.

. . .

Boppre makes no claim that the district court's failure to grant discovery of the requested items infringed his sixth amendment right to confrontation. Nor does Boppre claim that the prosecutor withheld evidence favorable to him and material to his guilt or innocence, and thus he raises no issue under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Even if he were making such claim, it would fail. Under *Brady* . . . although the due process clause requires the prosecutor to disclose exculpatory evidence which is material to the accused's guilt or innocence, such evidence is material only if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. See *State v. Jackson*, 231 Neb. 207, 435 N.W.2d 893 (1989). The record simply fails to demonstrate that the outcome of the trial would have been different had Boppre's discovery requests been granted.

234 Neb. at 942-43, 453 N.W.2d at 423. Jimenez makes no *Brady* claims, nor does he claim he was denied the opportunity at trial to request the notes pursuant to § 27-612. There is nothing in the record to show Jimenez was prejudiced by the denial of discovery of the notes, nor does the record demonstrate that the outcome of the trial would have been

different had Jimenez been given the personal notes of Overman prior to trial.

### 3. PROSECUTOR'S REMARKS DURING VOIR DIRE

Jimenez argues that during voir dire, the prosecutor made a remark which coached the venirepersons how to answer defense counsel's questions regarding potential bias on the nature of a charge of selling marijuana. In voir dire, one venireperson indicated that she was involved in antidrug programs in the school system and belonged to Mothers Against Drunk Driving. She was asked whether her affiliation with such groups caused her to have some predetermined ideas about drug cases, to which she answered:

> [Venireperson]: I would try to be impartial but I'm afraid it would, yes.

> [Defense attorney]: You said you would try to be impartial?

> [Venireperson]: Um-hum.

> [Defense attorney]: But then you indicated that you're afraid it would probably impact you?

> . . . .

> [Venireperson]: I just very severely am antidrug and it just causes too many problems with too many people and I'm afraid it might be a problem, yes.

The venireperson was excused for cause. The next venireperson was asked:

> [Prosecutor]: Ms. [venireperson], I assume you're not in favor of drugs either, I take it; is that right?

> [Venireperson]: Right.

> [Prosecutor]: Now, to be a juror, that doesn't mean you have to be in favor or not in favor of drugs, the question is really this, can you put aside your feelings, whatever they might be, and listen to the evidence, listening to what the Judge tells you is the law and make a decision based on the evidence and the law, can you do that?

> [Venireperson]: Right, I can do that.

> [Prosecutor]: Okay. If you can do that, you can be a juror in this case even if you don't like drugs.

At this point, Jimenez' attorney objected, alleging that the

prosecutor was coaching the venirepersons. The objection was overruled.

■ We fail to see how the prosecutor's remarks could be regarded as coaching. The prosecutor's remarks were a correct statement of the law. "The law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court." *State v. Boppre*, 234 Neb. 922, 936, 453 N.W.2d 406, 420 (1990).

### 4. WITNESS' REMARKS ON CROSS-EXAMINATION

Jimenez alleges the district court erred when it did not give an immediate curative jury instruction after Overman testified that Jimenez told him he did not want to talk to the police until he had talked to an attorney. The following cross-examination of Overman was had by Jimenez' counsel: "Q. Mr. Jimenez said he didn't do this crime, didn't he? A. As I recall, Mr. Jimenez said he didn't want to talk to us without a lawyer." Jimenez' counsel immediately objected to Overman's testimony as nonresponsive. The objection was overruled.

Overman's answer, in our opinion, was unresponsive. A responsive and accurate answer to the question would have been: "No, he didn't say that," or "Yes, he said he didn't do the crime." Because Overman's answer was not only unresponsive but also commented upon Jimenez' *Miranda* right to remain silent and request counsel, we must decide whether the district court's refusal to give a curative instruction amounted to prejudicial error and whether such prejudicial error was harmless beyond a reasonable doubt.

Cases in which evidence of a defendant's silence and request for counsel are put before the jury fall into two categories: (1) those in which the evidence is used to impeach the defendant's testimony at trial and (2) those in which the evidence is used to imply guilt. In the first category, the state may not refer to post-*Miranda* silence to impeach an exculpatory story told by the defendant for the first time at trial. *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988); *State v. Wells*, 229 Neb. 89, 425 N.W.2d 338 (1988); *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct.

2240, 49 L. Ed. 2d 91 (1976). In contrast, the defendant's prearrest, pre-*Miranda* silence may be used to impeach the defendant's exculpatory testimony. *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981). The record here does not reveal whether the conversation testified to by Overman was prearrest or postarrest or pre- or post-*Miranda* warnings. "[A]ny ambiguity regarding precisely when the defendant declined to talk to the police impermissibly taints evidence of the defendant's silence." *State v. Wells*, 229 Neb. at 102, 425 N.W.2d at 346.

■ The second category of cases includes those in which, during the state's case in chief, the state has introduced evidence of the defendant's silence. The Nebraska Supreme Court has made it very clear that such references in the state's case in chief are impermissible, regardless of whether the silence was pre-*Miranda* or post-*Miranda*. *State v. Rowland*, 234 Neb. 846, 452 N.W.2d 758 (1990). The purpose of the state's references to a defendant's silence in such a case is not to impeach, but "to suggest that he was guilty . . . . [While] impeachment by silence [may be] permissible, the government may not argue that a defendant's silence is inconsistent with a claim of innocence." *U.S. ex rel. Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir. 1987). Thus, had the prosecutor in this case solicited Overman's answer, Overman's testimony would clearly be inadmissible under *State v. Rowland, supra*. The question is whether Overman's testimony still creates error when Overman volunteered the information in an unresponsive answer to Jimenez' counsel on cross-examination.

■ In *United States v. Shaw*, 701 F.2d 367 (5th Cir. 1983), *cert. denied* 465 U.S. 1067, 104 S. Ct. 1419, 79 L. Ed. 2d 744 (1984), the government argued on appeal that a police officer's testimony at trial regarding the defendant's silence was "gratuitous, merely a recitation of events, and did not constitute an invitation to the jury to infer [the defendant's] guilt from the fact of his silence." *Id*. at 381. However, the court found that "the identity of the person making the improper comment regarding a defendant's silence is not dispositive . . . but rather . . . the examination should focus on the effect of the comment upon the jury." *Id*. at 381 n.8.

We believe that Overman's testimony, which he volunteered

in an unresponsive answer during cross-examination, must be viewed for what it was. The testimony was from one accustomed to testifying, obviously identified with the prosecution, who injected Jimenez' exercise of his right to remain silent and consult with counsel into the case. It appears to be an attempt by the witness to have the jury infer guilt from the desire to remain silent and speak with counsel. The question of Jimenez' counsel which generated Overman's response seems clearly designed to imply innocence while avoiding placing Jimenez on the stand to make that claim himself. At first blush, this gives us some concern. Nonetheless, the answer went beyond the question and was unresponsive. As a timely objection was made on the ground of unresponsiveness, it should have been sustained and the jury immediately instructed to disregard Overman's response. However, since the trial court overruled the objection and did not give an immediate cautionary instruction, as defense counsel requested, we must now examine the effect of Overman's volunteered statement upon the jury in the proper context. In our view, the proper context is that there was an error in allowing inadmissible testimony to be placed before the jury. It cannot be characterized as a matter of no import, since the erroneously admitted evidence details the exercise by Jimenez of a constitutional right to remain silent and have the assistance of counsel at a point in time (prearrest or postarrest or pre- or post-*Miranda* warnings) indiscernible from the record.

"An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless it can be said that the error was harmless beyond a reasonable doubt." *State v. Rowland*, 246 Neb. at 853, 452 N.W.2d at 763. In the case at hand, Jimenez' objection to Overman's answer was overruled, and no immediate curative jury instruction was given. The proof linking Jimenez to the crime committed is certainly less than overpowering. The State's case relies heavily on the testimony of the cooperating individual. It may well be true that the jury perceived the evidence of Jimenez' request for counsel as evidence of his guilt, thus filling in the crucial nexus connecting him to the crime he was accused of having committed. Therefore, we

cannot say that the admission of Overman's testimony, without an immediate curative instruction, was harmless beyond a reasonable doubt.

5. CORROBORATION OF TESTIMONY OF COOPERATING INDIVIDUAL

Jimenez alleges that the trial court should have granted his motion to dismiss at the end of the evidence, because the State failed to present evidence which sufficiently corroborated Hubbard's testimony regarding the transaction. This assignment generally attacks the sufficiency of the evidence to sustain Jimenez' conviction. Although we believe the admission of Overman's testimony was reversible error, it is necessary to a complete resolution of this appeal for us to examine the sufficiency of the evidence to support Jimenez' conviction. In *State v. Lee*, 227 Neb. 277, 417 N.W.2d 26 (1987), the defendant appealed her convictions for possession of marijuana with intent to deliver and possession of cocaine. On appeal, she claimed an improper joinder of her trial with that of a codefendant and that the evidence was insufficient to support the convictions. The Supreme Court, having concluded that the joinder was improper and that it was reversible error, stated that it was still "necessary to examine the sufficiency of the evidence to support Lee's convictions." *Id.* at 283, 417 N.W.2d at 30. By way of explanation for this, the court stated:

As we noted in *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986): "[T]he U.S. Supreme Court [has] held that an appellate finding of insufficient evidence to convict is tantamount to an acquittal and, therefore, that the double jeopardy clause precludes a second trial once the reviewing court has found the evidence legally insufficient." *Id.* at 295-96, 399 N.W.2d at 718 (citing *Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978)). . . . If it appears the evidence is sufficient to support the convictions, the cause may be remanded to the district court for further proceedings; if the evidence is not sufficient under *Palmer, supra*, the cause must be dismissed.

*State v. Lee*, 227 Neb. at 283, 417 N.W.2d at 30.

*Lee* teaches of the *necessity* for an appellate court to address

a claim of insufficiency of the evidence, even though a trial error has occurred which otherwise demands a reversal, because if the evidence is insufficient to sustain the conviction, the cause must be dismissed rather than remanded for further proceedings.

Under § 28-1439.01, "No conviction for an offense punishable under any provision of the Uniform Controlled Substances Act shall be based solely upon the uncorroborated testimony of a cooperating individual." The Nebraska Supreme Court has held that "corroboration is sufficient if the witness is corroborated as to material facts and circumstances which tend to support the testimony as to the principal fact in issue." *State v. Beckner*, 211 Neb. 442, 447, 318 N.W.2d 889, 893 (1982).

Jimenez argues that in this case there is insufficient corroboration that he was the person that sold Hubbard the marijuana. In addition, he argues that it is insufficient corroboration to have the cooperating individual identify the voices on the tape. Because he alleges there was no independent identification of Jimenez as the seller, beyond Hubbard's testimony, Jimenez argues that Hubbard's testimony was uncorroborated, and the conviction cannot stand.

Jimenez argues that under *State v. Knoefler*, 227 Neb. 410, 418 N.W.2d 217 (1988), "for the corroboration to be sufficient there needs to be observation that the meeting between the subject and the cooperating individual took place." Brief for appellant at 10. Jimenez misreads *Knoefler*. At issue in *Knoefler* was whether a cooperating individual's testimony that a sale of drugs took place was corroborated when a body microphone malfunctioned and police failed to record the transaction. The only corroboration was a search of the cooperating individual and his automobile before the sale, the observation by the officers that the cooperating individual met with the defendant, and that the cooperating individual had drugs on his person after he met with the defendant. The *Knoefler* court noted that in *State v. Beckner, supra,* the court had listed various methods of corroboration, but the *Knoefler* court stated that "[s]uch language was illustrative only. *Beckner* expressly rejected the argument that a cooperating individual be corroborated on every element of the crime. . . . We have not at

any time implied that corroboration is absent if one or more investigative techniques [are] not employed . . . ." 227 Neb. at 413, 318 N.W.2d at 219.

The court in *Beckner* noted that the legislative history of § 28-1439.01 established that

"[a] corroboration requirement does not mean that a commissioned law enforcement agent would have to be physically present at the time a drug purchase is made. Corroboration could be supplied, by instance, through the use of electronic surveillance, observations which indicate simply that the meeting between the subject and the cooperating individual actually took place, searches of the cooperating individuals both before and within a reasonable time after the drug purchase is alleged to have taken place, the use of marked buy money, the use of cooperating individuals in teams, the use of fingerprint analysis and numerous other investigative techniques."

211 Neb. at 446-47, 318 N.W.2d at 892-93. The *Beckner* court further noted that during floor debate on the legislation which enacted the predecessor of § 28-1439.01, the corroboration needed under § 28-1439.01 was equated to that needed to support a conviction for the offense of rape. "In that regard this court has previously held that corroboration is sufficient if the witness is corroborated as to material facts and circumstances which tend to support the testimony as to the principal fact in issue." *State v. Beckner*, 211 Neb. at 447, 318 N.W.2d at 893.

The principal fact in issue in this case is the identity of the person who sold the marijuana to Hubbard. The identity of the perpetrator of a criminal offense may be proven by inference and circumstantial evidence. *State v. Mecum*, 225 Neb. 293, 404 N.W.2d 431 (1987); *United States v. Royals*, 777 F.2d 1089 (5th Cir. 1985); *United States v. Lawrence*, 699 F.2d 697 (5th Cir. 1983), *cert. denied* 461 U.S. 935, 103 S. Ct. 2103, 77 L. Ed. 2d 309; *United States v. Quimby*, 636 F.2d 86 (5th Cir. 1981). Under § 29-1439.01, Hubbard's testimony, standing alone, that Jimenez sold him the marijuana is not enough, and corroboration of the drug seller's identity must be had. However, corroboration that Jimenez was the person who sold

that marijuana to Hubbard may be had by circumstantial evidence.

The Gering Police Department first learned of Jimenez from Hubbard, who had identified Jimenez to police as someone from whom Hubbard could buy marijuana. Overman testified at trial that Hubbard gave police the description of the apartment building in which Hubbard stated Jimenez lived. The police then determined the exact address of the building by checking customer lists of utilities and determined that Jimenez' mother resided in the apartment building. Overman said that the apartment building matched Hubbard's description of the building in which Hubbard stated Jimenez lived. Overman stated that after the building was identified, he drove past the building multiple times in a week and observed Jimenez at the location. Finally, on the tape, one can hear Hubbard knock on a door, which someone answers, of whom Hubbard asks, "Hey, is Fernando around?" While one cannot hear the person's response, one can hear that Hubbard is admitted inside.

■ Jimenez alleges that the tape recording of the drug transaction between Hubbard and Jimenez is insufficient evidence because Hubbard was corroborating his own testimony. "[T]ape recordings of relevant and material conversations are admissible as evidence of such conversations and in corroboration of oral testimony of the conversations, provided proper foundation is laid." *State v. Loveless*, 209 Neb. 583, 589, 308 N.W.2d 842, 846 (1981).

In *State v. Taylor*, 221 Neb. 114, 375 N.W.2d 610 (1985), the court held that a tape recording of a drug transaction offered for corroboration was admissible, as sufficient foundation had been laid by the cooperating individual's testimony. The defendant complained that the recording should have been inadmissible because the voices on the tape were not properly identified. However, the court noted that the cooperating individual testified that the defendant was the person from whom he had purchased the drugs and that the defendant was the only male spoken to during the transaction. "The jury heard the agent testify and also make the introduction to the tape. This would enable the jury to discern between the two

male voices on the tape. . . . Other voices on the tape were merely incidental and did not relate to the drug transaction." *Id.* at 117, 375 N.W.2d at 613. In the case before us, the tape recording made of the actual drug transaction contains only two male voices. Hubbard testified that the transaction took place in Jimenez' bedroom. The jury had an opportunity to hear Hubbard's voice when he testified and compare it to the voices on the tape. The tape corroborates the details of Overman's and Hubbard's testimony. On the tape, Hubbard indicates to Jimenez that he has $100 to buy marijuana. Jimenez states that he will let Hubbard have the marijuana for $90. The two talk about the size of the buds on the marijuana and that the marijuana "[s]mells kind of mildewy." Hubbard finishes a beer; leaves the building; gets in a car; and drives off, telling the police officers who are monitoring the transaction which direction he is headed. Hubbard gave the marijuana to Overman, and Hubbard and his vehicle were searched. On Hubbard's person, Overman found $10 in change from the $100 he gave Hubbard for buy money.

In short, the State's evidence did not consist solely of the uncorroborated testimony of Hubbard. When viewed most favorably to the State, it is sufficient to support the verdict. This conclusion, however, in no way mitigates the trial error which occurred. That error was not harmless, and reversal must follow.

## V. CONCLUSION

We find that the jury instructions complained of were correct statements of the law, and therefore there was no error. Next, we find that there is nothing in the record to show Jimenez was prejudiced by the denial of discovery of Overman's personal notes, nor does the record demonstrate that the outcome of the trial would have been different had Jimenez been given the personal notes of Overman prior to trial. In addition, we do not find that there was any error in overruling Jimenez' objection to the questions and remarks made by the prosecutor to the venirepersons. However, we conclude that evidence of Jimenez' silence and request for an attorney was wrongfully admitted over proper objection and that such error was not harmless.

Hubbard's testimony was sufficiently corroborated in this case, and the evidence was legally sufficient to support Jimenez' conviction. Nevertheless, because of the erroneous admission of evidence of Jimenez' silence and request for an attorney, we must reverse the conviction and sentence and remand the cause to the district court for a new trial.

REVERSED AND REMANDED.

HANNON, Judge, dissenting.

I find I must dissent from that portion of my colleagues' opinion that holds the trial court committed prejudicial error by not sustaining the defense counsel's objection to Detective Overman's improper answer to his question. The answer was nonresponsive, and therefore I agree the objection should have been sustained, and upon request the jury should have been instructed to disregard the answer. See *Cardenas v. Peterson Bean Co.*, 180 Neb. 605, 144 N.W.2d 154 (1966). However, in my view, the defense opened up the matter. By asking a question which implied the defendant had asserted his innocence upon his initial contact with the police, defense counsel waived his client's right to prevent the State from proving that he asserted his right to remain silent. The trial judge should have sustained the objection, and then upon request the State should have been allowed to ask what the defendant really said at that time. The same evidence would have been before the jury by either route. Therefore, the improper shortcut was not prejudicial to the defendant, particularly when the prosecutor never sought to use the police officer's statement in his questions or arguments.

I base my position on a line of cases that are based upon a footnote found at the end of the majority opinion in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). That footnote states:

It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States* v. *Fairchild*,

505 F. 2d 1378, 1383 (CA5 1975).
426 U.S. at 619-20 n.11.

What happens when the defense seeks to avoid the effect of the *Fairchild* exception by the defendant's attorney asserting on cross-examination of a police officer that the defendant protested his or her innocence? In the case *State v. Hjerstrom*, 287 N.W.2d 625, 628 (Minn. 1979), the opinion states: "The prosecutor sought and obtained permission to elicit [certain] testimony only after defense counsel, in cross-examining the arresting officer, asked a series of questions for the purpose of showing that the arresting officer had not questioned the defendant in any detail about what he had been doing." The prosecutor elicited testimony from a different officer that he had attempted to get a complete story from the defendant, and cross- and recross-examination showed that the defendant had remained silent after being given *Miranda* warnings.

In that case, the Minnesota court approved the examination, stating:

> Here defense counsel tried to create the impression on cross-examination of the arresting officer that the police were not interested in letting defendant give his full and complete version of what had happened on the evening in question, so it was proper for the state to rebut this by showing that the police had tried but were unable to obtain a complete statement from defendant.

287 N.W.2d at 628.

In a similar case, *State v. Bell*, 446 So. 2d 1191 (La. 1984), the Louisiana court approved cross-examination which elicited the invocation of *Miranda* silence and in so doing, stated: "In *Fairchild*, a defendant's post-arrest silence was admissible to rebut a contention of active cooperation with the police when in fact the defendant had invoked his Fifth Amendment rights." 446 So. 2d at 1193. The Louisiana court stated that the "defendant invited the state's inquiry into what happened in the early stages of the investigation." *Id*. at 1193-94. In my opinion, the defendant's attorney invited Overman's nonresponsive answer. I would affirm the conviction and sentence.