Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/17/2024 09:07 AM CDT

State of Nebraska, appellee, v.
Alvaro F. Monterroso, appellant.

___ N.W.3d ___

Filed September 10, 2024.    No. A-23-735.

1. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for the sufficiency of the evidence, an appellate court determines whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

4. **Trial: Evidence: Appeal and Error.** An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.

5. **Trial: Juries: Appeal and Error.** The retention or rejection of a juror is a matter of discretion for the trial court. This rule applies both to the issue of whether a venireperson should be removed for cause and to the situation involving the retention of a juror after the commencement of trial. Thus, the standard of review in a case involving discharge of a juror is whether the trial court abused its discretion.

6. **Sentences: Appeal and Error.** A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court.

7. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which

turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

8. **Effectiveness of Counsel: Appeal and Error.** In reviewing a claim of ineffective assistance of counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.

9. **Trial: Pretrial Procedure: Pleadings: Evidence: Juries: Appeal and Error.** A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury. It is not the office of a motion in limine to obtain a final ruling upon the ultimate admissibility of the evidence. Therefore, when a court overrules a motion in limine to exclude evidence, the movant must object when the particular evidence is offered at trial in order to predicate error before an appellate court.

10. **Trial: Tape Recordings: Evidence: Corroboration.** Tape recordings of relevant and material conversations are admissible as evidence of such conversations and in corroboration of oral testimony of the conversations, provided proper foundation is laid.

11. **Trial: Tape Recordings: Juries.** Partial inaudibility or indistinctness does not require exclusion of a sound recording unless those portions are so inaudible and indistinct that the jury must speculate as to what was said.

12. **Trial: Tape Recordings: Evidence.** A recording is admissible unless the unintelligible portions of the tape recording are so substantial as to render the recording as a whole untrustworthy.

13. **Witnesses: Interpreters.** Foundation is sufficient where the translator of a defendant's out-of-court verbal or written statements from a foreign language to English is initially shown by the State to be qualified by knowledge, skill, experience, training, or education to perform such translation.

14. **Appeal and Error.** An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on some other ground not specified at trial.

15. **Criminal Law: Juror Misconduct: Proof.** Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming misconduct.

16. ____: ____: ____. The party seeking to discharge a juror has the burden to show that the juror was biased, engaged in misconduct, or was otherwise unable to continue to serve.

17. **Trial: Motions for Mistrial: Waiver: Appeal and Error.** When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error.

18. **Convictions: Evidence: Appeal and Error.** The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

19. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed.

20. ____: ____. When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

21. **Sentences.** The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

22. **Effectiveness of Counsel: Appeal and Error.** In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

23. ____: ____. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.

24. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.

25. **Effectiveness of Counsel: Proof: Appeal and Error.** When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.
26. **Effectiveness of Counsel.** As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument.

Appeal from the District Court for Lancaster County: Jodi L. Nelson, Judge. Affirmed.

Kristi J. Egger, Lancaster County Public Defender, and Matthew F. Meyerle for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

Pirtle, Chief Judge, and Arterburn and Welch, Judges.

Welch, Judge.

## I. INTRODUCTION

Alvaro F. Monterroso appeals from his jury convictions for first degree sexual assault of a child and incest. He contends that the district court committed evidentiary errors, erred in failing to strike a juror for misconduct, erred in finding the evidence was sufficient to sustain his conviction of first degree sexual assault of a child, and imposed excessive sentences. He also contends that his trial counsel was ineffective. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

In June 2022, 24-year-old N.M. disclosed to her mother that Monterroso had sexually abused her when she was a child. Monterroso is N.M.'s biological father. After Monterroso admitted, during a recorded controlled call, that he had sexually abused N.M., the State charged him with first degree sexual assault of a child, a Class IB felony, and incest, a Class III felony. See, Neb. Rev. Stat. § 28-319.01(2) (Reissue 2016);

Neb. Rev. Stat. § 28-703 (Reissue 2016). An amended information was filed that amended the dates of the offenses, alleging them to have occurred on, about, or between July 1, 2007, and October 14, 2013.

### 1. PRETRIAL MOTIONS

Prior to trial, Monterroso filed a motion in limine to exclude the expert testimony of Dr. Barbara Sturgis relating to percentages or rates of children that make false allegations of sexual abuse; explaining her definition of trauma; and speculating on whether the alleged victims have or will suffer trauma, how sexual abuse could affect children later, what symptoms sexual abuse could cause later in life, or what the lasting consequences could be. Monterroso alleged that the testimony was inadmissible due to being improper evidence under Neb. Rev. Stat. §§ 27-701 and 27-702 (Reissue 2016), the testimony was bolstering, the testimony was an indirect challenge to a witness' credibility, and the probative value of the testimony was substantially outweighed by the danger of unfair prejudice under Neb. Rev. Stat. § 27-403 (Reissue 2016). Following a hearing, the district court overruled Monterroso's motion with the exception that it sustained the motion as to the testimony related to percentages.

On August 8, 2023, the State made an oral motion related to its intent to offer into evidence, publish to the jury, and have read into the record translated statements from Monterroso's law enforcement interview, the controlled call between Monterroso and N.M., and a jail call between Monterroso and two other individuals. Counsel for Monterroso indicated that with proper foundation, he would not be objecting to the admission of the translated statements but did object to portions being read into the record if not read in its entirety. Monterroso's counsel stated, "If it's the entire thing, that's fine." After the State agreed that it would be offering the entire transcript, the court indicated it was a "none issue [sic]."

## 2. TRIAL

Trial was held over 2 days in August 2023. The State adduced testimony from witnesses, including N.M.; N.M.'s mother; Giselle Hogan, an investigator with the Lincoln Police Department; Vanessa Medina, a records technician with the Lincoln Police Department; Dr. Sturgis, a psychologist; and Monterroso's friend Edwin Sandoval and his wife, Brenda Villalta-Bolanos. The State offered, and the court received, multiple exhibits, including translated transcriptions from a recorded controlled call between N.M. and Monterroso, a recorded jail call between Monterroso and two witnesses, and Monterroso's recorded postarrest interview.

### (a) Evidence Relating to Monterroso's Arrest, Extradition, and Postarrest Interview

In June 2022, N.M. disclosed to her mother that Monterroso had sexually abused N.M. when she was a child. Shortly after N.M.'s disclosure, N.M. and her mother went to a victim's assistance unit to obtain a protection order against Monterroso. Monterroso, who was a truckdriver, was in Pennsylvania and was expected to return in a few days. While at the victim's assistance unit, N.M. was interviewed by Investigator Hogan and again disclosed that Monterroso had sexually abused her. After the interview, N.M. participated in a controlled call to Monterroso that was recorded and received into evidence. During the call, which was later translated and transcribed from Spanish to English, the following conversation occurred between N.M. and Monterroso:

[N.M.:] . . . [R]emember what we used to do?

[Monterroso:] (inaudible) yeah, I know, sweetheart. You know, things happen so —

. . . .

[N.M.:] Do you still love me in that way?

[Monterroso:] I love you whatever you want 'cause, uh, I really miss you.

[N.M.:] What do you think about when you think of me?

[Monterroso:] Everything. I know your body.

[N.M.:] I want that way back.

[Monterroso:] You wanna — you wanna keep going like that?

[N.M.:] Yeah.

[Monterroso:] Okay.

[N.M.:] Tell me more.

[Monterroso:] Uh, I wanna see — I wanna see how your tits look now — now. I wanna taste them again.

[N.M.:] Tell me.

[Monterroso:] And I wanna eat the thing on your bottom, too. I love that thing.

. . . .

[N.M.:] — what if my mom finds out?

[Monterroso:] Uh, I don't know. We just — we're gonna to keep going, uh, was doing it — we used to do it, so keep on doing that way because at the beginning I was trying to talk to your mom and (inaudible) everything so that way we can all be together — we can be all together. But I don't think your mom is gonna be able to look at that that way.

. . . .

[Monterroso:] I'm not gonna move out. I wanna be with you. I wanna keep making love to you. I miss you.

[N.M.:] What was your favorite thing of foreplay?

[Monterroso:] (Translating from Spanish) Eat you — eat you entirely.

. . . .

[N.M.:] Tell me what you're gonna do to me.

[Monterroso:] Everything. I'm gonna eat you again.

[N.M.:] Um —

[Monterroso:] I'm gonna see how your — your thing on the bottom is now. I love that.

[N.M.:] What thing? Give me —

[Monterroso:] Uh —

[N.M.:] — um, give me more.

[Monterroso:] We make a lot of love, so I really miss your thing on the bottom. That's so good. And I really love you, so that's why I was trying to stay away and everything, but that's impossible because I can see you every day and, uh, you're so good so —

[N.M.:] What do you prefer vaginal, anal?

[Monterroso:] Vaginal, (translating from Spanish) and for you to eat it all. I like when you eat me. I miss that thing.

[N.M.:] You like me to perform oral on you?

[Monterroso:] Oh, yeah.

. . . .

[N.M.:] But what do you think? What if other people find out, and they know that I'm your daughter?

[Monterroso:] No, because, uh, we've been doing this for a long time, and nobody finds out so —

[N.M.:] I don't know, do you think it's wrong?

[Monterroso:] I don't think so. You know, all the — all the love (inaudible) on earth (inaudible) everything, people have been (inaudible) that thing, not the — who you are because that's, uh — that's your — we are part of the human animals. So the animals, they behave the same way.

So it's just, uh — is really hard for people to understand things, but —

[N.M.:] But what if you prefer my younger self? I'm not — I don't look the same.

[Monterroso:] You are the same for me. You're always gonna be the same.

[N.M.:] So it - it really doesn't bother you that I'm your daughter?

[Monterroso:] No. No, because, uh, I see you as a woman, not as a daughter so —

[N.M.:] Does it make you want me?

[Monterroso:] (Inaudible)

[N.M.:] Does it make you want me more?

[Monterroso:] Oh, yeah.

. . . .

[Monterroso:] It's — it's been hard for me, too. You know, just — I love you so much. Is so hard for me not to touch you, not to do things to you, anything, so — but, um —

. . . .

[N.M.:] Wait, but what if you prefer me better when I was little than now?

[Monterroso:] You are the same to me as you are little — as you are now. You're the same.

[N.M.:] Yeah, but —

[Monterroso:] You're the same woman. The one I love so —

[N.M.:] But remember back then I didn't have stretch marks.

[Monterroso:] It doesn't matter. (Inaudible) listen to me, what you feel in your heart and how we feel to be together and all these stuff, that's what it comes. The rest — I'm getting old, too, (inaudible) so —

[N.M.:] Yeah.

[Monterroso:] Why is gonna change anyway?

[N.M.:] But I won't be as small.

[Monterroso:] You're always gonna be my baby. So let me get — let me come home, get home, and then we can talk, and then we can enjoy again. And then we can figure out, okay?

After the controlled call, Monterroso was arrested 3 days later in Pennsylvania. While waiting to be extradited to Nebraska, Monterroso made a phone call to Sandoval and Villalta-Bolanos. During the recorded jail call, which was conducted in Spanish and later translated into English and transcribed, Monterroso admitted that

the biggest one there is, that's true. But I didn't do anything. . . . I can't tell you if it was my daughter's fault,

> I can't tell you if it was my fault because I'm an adult. I
> needed to stop all of that in the moment.
>      So I am aware of that . . . and that's why I don't have
> any problem because my conscience is clean because I
> never did anything outside of — of what we could do as
> father and daughter.

Both Sandoval and Villalta-Bolanos testified that the recording
of the jail call conducted in Spanish was a fair and accurate
recording of the jail call.

After being extradited from Pennsylvania, Monterroso was
interviewed by Investigator Hogan. Investigator Hogan tes-
tified that after Monterroso waived his *Miranda* rights, he
admitted having either penile-vaginal or penile-anal sex with
his daughter, N.M., on three occasions and that they also
participated in oral sex an undisclosed number of times. The
interview was recorded and subsequently translated and tran-
scribed from Spanish to English and received into evidence
during the trial.

### (b) N.M.'s Testimony

N.M. testified that she and her family moved from
California to Nebraska in 2007. At that time, N.M. was 9
years old. N.M. testified that Monterroso began sexually
abusing her when she was in middle school and that the abuse
was "actually a progression from kissing on the mouth, and
then it was . . . digitals, finger stimulation." She testified that
Monterroso would

> insert his fingers into my vagina, and then he moved onto
> oral, and that was his mouth on my vagina. And then —
> which moved onto my mouth on his penis, then moved to
> anal, in which he penetrated my butt with his penis. And
> then it was vaginal, in which he penetrated . . . my vagina
> with his penis.

N.M. testified that Monterroso digitally penetrated her
vagina more than 20 times, that sexual acts occurred more
than 50 times in her bedroom, more than 50 times in her

parent's bedroom, and about 20 times in the living room. She testified that sometimes the abuse occurred when her mother was taking a shower during the evenings or when her mother went to the grocery store. N.M.'s mother testified that during the period of time when the abuse was alleged to have occurred, Monterroso "would make me take a shower at night" even though she showered every morning.

N.M. testified that the abuse began before she started her menstrual cycle, because her menstrual cycle started when she was 11 years old, and that she remembered Monterroso saying, "[W]e have to be more careful now," which she understood to mean was to avoid pregnancy. At some point, N.M. told Monterroso that what they were doing was wrong and that she did not want it to continue. N.M. testified that Monterroso responded by saying that "he did not want to be turned in, that he said that he would rather die than go to jail, and then that he didn't want me to use this as blackmail against him." N.M. testified that, after that conversation, the abuse stopped for a few months, but then

> he started groping me. . . . [E]very time he hugged me, he would put his hand against my breast.
>
> He would slap my butt if my mom's back was turned. He would accidentally kiss me on the lips. He would make sexual advances that — all of them I would reject.

N.M. testified that, although she was unsure of the specific date when the abuse stopped, the abuse no longer occurred after November 2013. N.M. explained that she knew the abuse stopped prior to November 2013 because at that time, she was 16 years old and she had sustained a concussion.

### (c) Dr. Sturgis' Testimony

Dr. Sturgis testified generally as it related to "what it is like for kids to disclose any kind of abuse, including sexual abuse," as well as the rates of disclosure, nondisclosure, and delayed disclosure. She testified that younger children generally do not report sexual assault right away because they do

not understand that what is occurring is abuse but, as they get older, they "feel extraordinarily guilty," "ashamed," and "dirty." She stated that "this is probably the most difficult therapeutic thing to work on for either children at the time or adults who were molested as children." She also stated children are afraid that they will not be believed; that if the offender is a family member, it will disrupt the family; that if the offender is the breadwinner, it will disrupt the family economics; and that there may be retribution by the perpetrator or the nonoffending caretaker. According to Dr. Sturgis, "for some kids, the relationship with the perpetrator is the closest one they've got. They love the perpetrator. They may not like . . . what's happening to them, but they really don't want to lose that relationship." Specific to Hispanic families, Dr. Sturgis testified, "There seems to be, if it can be even more, a greater pressure on children in those families to not disrupt the family . . . . Just keep the family together, and put up with whatever you have to put up with."

### 3. Verdicts and Sentencing

The jury found Monterroso guilty of first degree sexual assault of a child and incest. During sentencing, the district court indicated that it had reviewed the presentence investigation report (PSR), Monterroso's statements, and the relevant sentencing factors. The district court found that a sentence less than a term of imprisonment would "depreciate the inordinately serious nature of these crimes, and would promote disrespect for the law" and stated:

> I also sat through the trial in this matter, and it is without doubt one of the most egregious cases of sexual abuse I have seen in my many years.
>
> . . . Monterroso selfishly sexually assaulted his daughter for many years. He violated his position of trust as a father, as a leader in his family, began subjecting his daughter to sexual activity at a young age, and manipulated the family dynamic so that he had access and total control.

In his statements, both in the [PSR], as well as here today, he ignores his role in all of this, minimizing his role, blaming just about everybody else he can blame, certainly including his daughter, the school system, his family, and anybody else he can name.

He fails to acknowledge or even see the damage his conduct has had on his daughter as well as collaterally on his wife and son.

Really, in so many ways, the controlled call that was part of the evidence here in this case says it all. He was willing to continue to engage in a sexual relationship with his daughter.

He saw no problem with it. It had happened for years, he calls it love. It is not love. It is abuse. It is crime. It is manipulation. And it is punishable.

The court further stated that factors, including the need for punishment, the need for deterrence, the need to protect society from a dangerous perpetrator, and the likelihood that Monterroso would engage in additional criminal conduct if placed on probation, influenced the court's determination that imprisonment was necessary.

The court sentenced Monterroso to 50 to 70 years' imprisonment with a 15-year mandatory minimum for first degree sexual assault of a child and sentenced him to 10 to 20 years' imprisonment for incest. The sentences were ordered to run consecutively, and Monterroso was given credit for 443 days already served. Monterroso has now appealed his convictions and sentences.

## III. ASSIGNMENTS OF ERROR

Monterroso assigns, renumbered and restated, that the district court erred in (1) overruling his motion in limine to exclude the expert testimony of Dr. Sturgis; (2) admitting translated transcriptions from his controlled call, a jail phone call, and his interview with law enforcement; (3) failing to strike or excuse one of the jurors due to misconduct; (4)

finding that the evidence was sufficient to sustain his conviction for first degree sexual assault of a child; and (5) imposing excessive sentences; and that (6) he received ineffective assistance of trial counsel when his counsel (a) failed to request a "*Daubert-Schaffersman*" (*Daubert*) hearing to challenge the admissibility of Dr. Sturgis' testimony and failed to renew his motion in limine to her testimony; (b) failed to move to strike one of the jurors due to his inattentiveness or alleged sleeping during the trial; (c) failed to object based on confrontation and hearsay to the admission of exhibits 8 and 11 when the translator of the statements was not called to testify at trial; and (d) failed to object or move to strike from the PSR a letter written by his former sister-in-law.

## IV. STANDARD OF REVIEW

[1] In reviewing a criminal conviction for the sufficiency of the evidence, an appellate court determines whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022).

[2-4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Lierman, supra.* An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

[5] The retention or rejection of a juror is a matter of discretion for the trial court. *State v. Huff*, 298 Neb. 522, 905

N.W.2d 59 (2017). This rule applies both to the issue of whether a venireperson should be removed for cause and to the situation involving the retention of a juror after the commencement of trial. *Id.* Thus, the standard of review in a case involving discharge of a juror is whether the trial court abused its discretion. *Id.*

[6] A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Lara*, 315 Neb. 856, 2 N.W.3d 1 (2024).

[7,8] Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Npimnee*, 316 Neb. 1, 2 N.W.3d 620 (2024). In reviewing a claim of ineffective assistance of counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. Motion in Limine

Monterroso first assigns that the district court erred in overruling his motion in limine to exclude Dr. Sturgis' testimony related to how sexual abuse affects children in the present or the future. He argues that the evidence was irrelevant, as well as that Dr. Sturgis directly or indirectly provided testimony expressing an opinion that the child is believable, that the child is credible, or that the witness' account has been validated, and was improper as stated in *State v. Doan*, 1 Neb. App. 484, 498 N.W.2d 804 (1993).

[9] A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury. *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020). It is not the office of

a motion in limine to obtain a final ruling upon the ultimate admissibility of the evidence. *Id.* Therefore, when a court overrules a motion in limine to exclude evidence, the movant must object when the particular evidence is offered at trial in order to predicate error before an appellate court. *Id.*

Here, although Monterroso's counsel filed a motion in limine as it related to Dr. Sturgis' testimony, counsel did not object to Dr. Sturgis' testimony when it was offered during the trial. Monterroso acknowledges that his counsel did not object to Dr. Sturgis' testimony during the trial but nonetheless argues that the testimony was irrelevant. However, because Monterroso did not properly preserve this claim for appellate review by objecting to the testimony during trial and by assigning error to the court's ruling on that trial objection, we need not consider this assignment of error.

## 2. Translated Transcriptions

Monterroso next assigns that the district court erred in admitting, over his foundation and "'inaudible' notations" objections in three exhibits: the translated transcriptions of the controlled call, the jail phone call, and his postarrest interview with law enforcement. Brief for appellant at 29. All three exhibits, which were translated from Spanish to English, were admitted into evidence, published to the jury, and read into the record.

Here, as to all of the transcriptions, Investigator Hogan testified that the process for obtaining the transcriptions required her to complete a report for the records unit. She testified that "[a]fter a transcription is done in the English language, since the interview was in Spanish, I'll review that transcription with the audio, and I follow along to make sure that it's a fair and accurate translation." Investigator Hogan testified that she is bilingual; her first language is Spanish; she is proficient in reading, writing, speaking, and grammar in both Spanish and English; and she speaks in Spanish daily in both her personal life and her professional life.

### (a) Jail Call

As it related to the transcription of the recorded jail call, defense counsel objected based on "the amount of inaudibles that are noted on the transcript." On appeal, Monterroso argues that the inaudible notations in the transcript rendered the transcription fundamentally unfair.

[10-12] In *State v. Taylor*, 221 Neb. 114, 117, 375 N.W.2d 610, 613 (1985), the Nebraska Supreme Court stated:

> We have held that "tape recordings of relevant and material conversations are admissible as evidence of such conversations and in corroboration of oral testimony of the conversations, provided proper foundation is laid." *State v. Loveless*, 209 Neb. 583, 589, 308 N.W.2d 842, 846 (1981).
>
> . . . .
>
> . . . Partial inaudibility or indistinctness does not require exclusion of a sound recording unless those portions are "'so inaudible and indistinct that the jury must speculate as to what was said. . . .'" *State v. Loveless, supra* at 589, 308 N.W.2d at 846. Even then, exclusion is discretionary "'unless the unintelligible portions of a tape recording are so substantial as to render the recording as a whole untrustworthy . . . .'" *Id.*

Medina testified that she provides translation services for the Lincoln Police Department, translating from Spanish to English; that she translated and transcribed Monterroso's recorded jail call; and that her translation and transcription of the jail call was a fair and accurate representation of the call.

Although the transcription shows that some inaudible portions exist, Investigator Hogan testified that "inaudible just means that either the person is mumbling, and you can't make out what it is that they're saying, or there's static or something where you just can't understand what the person is saying." She also testified that she was able to fill in some of the "inaudibles" after she reviewed the transcription.

Although Monterroso refers to small portions of the transcriptions that were inaudible, he fails to identify how those portions made the transcriptions incomplete, inaccurate, or an unfair representation of the audio recording. After reviewing the transcription of the recorded jail call, we find that the evidence adduced regarding the accuracy and completeness of the transcriptions was sufficient for the district court to find that it was reliable and trustworthy. This assignment of error is without error.

### (b) Controlled Call and Postarrest Interview

As it related to the transcriptions of the controlled call and Monterroso's postarrest interview, defense counsel objected based on foundation after a brief voir dire of Investigator Hogan wherein she stated that she did not complete the translations but was fluent in both Spanish and English and that the translated transcription of the call and postarrest interview were fair and accurate representations. Monterroso argues on appeal that the court erred in admitting into evidence the transcription of the controlled call and the postarrest interview because the translator of those two exhibits did not testify at trial.

[13] In *State v. Estrada Comacho*, 309 Neb. 494, 517-18, 960 N.W.2d 739, 756 (2021), the Nebraska Supreme Court stated:

> [I]n *State v. Martinez*, 306 Neb. 516, 530, 946 N.W.2d 445, 458 (2020), we set forth foundation requirements for translation of a defendant's out-of-court statements and stated that foundation is sufficient "where the translator . . . is initially shown by the State to be qualified by knowledge, skill, experience, training, or education to perform such translation." . . .
>
> . . . .
>
> The foundation requirement under *Martinez* is an initial showing that the translator is "qualified by knowledge, skill, experience, training, or education to perform

such translation." 306 Neb. at 530, 946 N.W.2d at 458. This standard does not require any particular type of training, education, or certification to provide translation as compared to one who is serving as an official interpreter of in-court testimony. Instead, it requires a showing that the translator's individual knowledge, skill, experience, training, or education is sufficient to indicate that the witness is qualified for the purposes for which he or she is testifying.

Although the individual who completed the initial translation and transcription of the recorded controlled call and Monterroso's postarrest interview did not testify during the trial, Investigator Hogan was present during the controlled call and the interview. Investigator Hogan testified that her first language is Spanish; that she is proficient in the reading, writing, grammar, and speaking of Spanish; and that she reviewed the transcriptions to ensure their accuracy. Monterroso does not take issue with Investigator Hogan's skill, training, or knowledge to translate the call and postarrest interview. Instead, he argues that because Investigator Hogan did not perform the original translation, she could not corroborate the original translation at trial. Stated differently, Monterroso argues that only the original translator could provide adequate foundation to enter the translations into evidence under the criteria set forth in *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020), *abrogated on other grounds, State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023). We disagree. Because foundation for the translated statement is satisfied when the translator is shown by the State to be qualified by knowledge, skill, experience, training, or education to perform such translation and because Investigator Hogan testified to her fluency, as well as her review of the translated documents and attested to their accuracy, we find that proper foundation was laid for the admission of the translated transcription.

[14] Further, although Monterroso appears to argue on appeal that the evidence was inadmissible as hearsay and a

violation of his right to confrontation, Monterroso did not assert those objections during the trial, and therefore, he waived appellate review on those bases. See *State v. Lowman*, 308 Neb. 482, 954 N.W.2d 905 (2021) (objection, based on specific ground and properly overruled, does not preserve question for appellate review on some other ground not specified at trial). This assignment of error fails.

### 3. JUROR MISCONDUCT

Monterroso assigns that the district court erred in failing to strike or excuse a juror after he appeared to be sleeping during the trial or was, "at a minimum, inattentive." Brief for appellant at 29.

[15-16] Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *State v. Huff*, 298 Neb. 522, 905 N.W.2d 59 (2017). The party seeking to discharge a juror has the burden to show that the juror was biased, engaged in misconduct, or was otherwise unable to continue to serve. See *id.*

During a sidebar outside the presence of the jury, the court informed counsel that "I'm watching [a named juror] sleeping, but he is not paying attention the same way a lot of people do, that's clear, but he's tired. But I have my eyes on him." Thereafter the court took a recess, and when the jury returned from the recess, both parties rested. Monterroso acknowledges that his counsel did not seek removal of the juror or move for a mistrial. Instead, Monterroso argues that the district court specifically commented on the juror's behavior, but failed to question the juror to determine if he could proceed and failed to excuse or replace the juror on its own motion.

[17] In *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010), the court addressed a defendant's claim that the court erred in failing to strike the juror earlier in the day when he was sleeping during trial. Instead, the

court admonished the jury about being vigilant. After the juror was caught sleeping a second time, the court struck the juror. The Nebraska Supreme Court stated:

> The record here does not suggest that the defendant was prejudiced. Nor did the defendant make a timely motion for mistrial based upon any perceived distraction. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error.

*State v. Robinson*, 272 Neb. at 637, 724 N.W.2d at 80.

Here, Monterroso's counsel did not make a motion for mistrial on the basis of the juror's conduct and therefore waived the alleged error. This assignment of error fails.

### 4. Sufficiency of Evidence

Monterroso assigns that the evidence was insufficient to sustain his conviction for first degree sexual assault of a child because the "State's case rested wholly on the testimony, credibility, and memory of N.M.," brief for appellant at 30; that N.M. was unable to place a specific date on the events; and that Monterroso's admissions indicate that the alleged sexual assault did not occur until after N.M. was 16 years old.

[18] The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022).

The offense of first degree sexual assault of a child is codified at § 28-319.01(1)(b) and provides in relevant part that a person commits first degree sexual assault of a child "[w]hen he or she subjects another person who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older."

Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2022) defines sexual penetration as

sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes. Sexual penetration shall not require emission of semen.

N.M. testified that the abuse started when she was 10 years old and in the sixth grade because, after she started her menstrual cycle around 11 years old, Monterroso told her that they needed to be more careful to avoid her getting pregnant. N.M. testified that Monterroso performed oral sex on her, engaged in digital penetration of her vagina, and engaged in both penile-anal and penile-vaginal penetration. Monterroso, having been born in December 1972, was over the age of 25 at the time of the alleged assaults. Although Monterroso argues that N.M.'s testimony was unreliable as to how old she was when the abuse occurred, an appellate court does not reweigh the evidence or make credibility determinations. After reviewing the record, including, but not limited to, N.M.'s testimony and the transcribed statement made by Monterroso, we find that the district court did not err in finding that the evidence was sufficient to sustain his conviction for first degree sexual assault of a child.

## 5. Sentencing

Monterroso next contends that the sentences imposed are excessive. He contends that in light of the "Vermont Assessment of Sex Offender Risk-2" and the "Sex Offender Treatment Intervention and Progress Scale" assessing him as a low risk to reoffend, combined with the court's sentences requiring him to "be subject to lifetime community supervision" following his release, as well as the possibility that he "may be the subject of a civil commitment evaluation," the sentences "constitute[d] an abuse of discretion." Brief for appellant at 39.

Monterroso was convicted of one count of first degree sexual assault of a child, a Class IB felony. See § 28-319.01. Class IB felonies are generally punishable by a minimum of 20 years' imprisonment to a maximum of life imprisonment; however, the offense of first degree sexual assault of a child carries a mandatory minimum of 15 years' imprisonment. See, Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022); § 28-319.01(2). See, also, *State v. Russell*, 291 Neb. 33, 863 N.W.2d 813 (2015) (range of penalties for first degree sexual assault of a child, first offense, under § 28-319.01(2), is 15 years to life imprisonment).

[19-21] Having determined that the sentences imposed by the court were within the applicable statutory sentencing ranges, we proceed to consider Monterroso's argument challenging the district court's consideration of factors supporting his sentences. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed. *State v. Lara*, 315 Neb. 856, 2 N.W.3d 1 (2024). When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

During the sentencing hearing, the district court stated that it had considered the PSR and the appropriate sentencing factors as defined in Neb. Rev. Stat. § 29-2260 (Reissue 2016). At the time the PSR was completed, Monterroso was 50 years

old and divorced and his two children had reached the age of majority. His highest level of education was seventh grade, and prior to his arrest, Monterroso was self-employed as a truckdriver. He had no prior criminal history with the exception of a speeding violation. During his interview with probation, Monterroso admitted that he "'had problems'" with N.M., that "the problem" was "'[w]hen she was around 15 or 16 we had sex,'" and that "'[t]he problem I have is I never looked at my daughter, it wasn't my fault. But because of my age that's why they put everything against me.'"

Although the assessment tools assessed Monterroso as a low risk to reoffend, the level of service/case management inventory assessed him as a medium-high risk to reoffend. The PSR specifically stated that Monterroso

was noted to greatly minimize his involvement in the pending case. He appeared to distance himself [from] responsibility by suggesting [that the] school system is responsible for promiscuous behavior reportedly initiated by the victim in this case. His description of the interaction between him and the victim appears to be an attempt at framing himself as a victim of unfortunate circumstances. He described [some of] the reports of the victim to be [a] misunderstanding and others to have been perpetrated by her. [Monterroso] does not appear to take responsibility for his actions in the pending case. [Monterroso] does not appear to recognize the potential damage he has caused to the victim in the past the present in the future. [Monterroso's] minimization of the pending case as well as the intrusive acts of the offense itself, represents aspects of an antisocial thinking pattern.

. . . Although [Monterroso] denied having any concerns with his sexual habits or sexual desires, [his] minimization of the pending case and [its] circumstances, suggests many of [his] answers during the interview do not reflect his actual risk. [Monterroso's] continued

involvement in deviant sexual behaviors perpetrated upon the victim throughout her youth, should be noted to represent a significant deficit in [Monterroso's] ability to appropriately regulate and express his sexual desire.

Based on our review of the record, the district court took the appropriate sentencing factors into consideration, noting the "inordinately serious nature of these crimes"; that the risk was "absolutely substantial" Monterroso could engage in additional conduct if in the community; that the need for deterrence was important; the level of Monterroso's minimization of his role and blaming "just about everybody else he can blame, certainly including his daughter, the school system, his family, and anybody else he can name"; and that Monterroso failed to "acknowledge or even see the damage his conduct has had on his daughter as well as collaterally on his wife and son." The district court specifically stated that the case was "without doubt one of the most egregious cases of sexual abuse I have seen in my many years." We therefore find that the district court did not err in considering or weighing the appropriate sentencing factors and that the sentence imposed was not excessive. This assignment of error fails.

6. INEFFECTIVE ASSISTANCE OF COUNSEL

Monterroso finally assigns that he received ineffective assistance of counsel when his trial counsel failed (a) to request a *Daubert* hearing to challenge the admissibility of Dr. Sturgis' testimony and to renew his motion in limine to her testimony, (b) to move to strike one of the jurors due to his inattentiveness or alleged sleeping during the trial, (c) to object based on confrontation and hearsay to the admission of exhibits 8 and 11 when the translator of the statements was not called to testify at trial, and (d) to object or move to strike from the PSR the letter submitted by his former sister-in-law.

[22-25] In *State v. Lierman*, 305 Neb. 289, 312-13, 940 N.W.2d 529, 548 (2020), the Nebraska Supreme Court stated:

In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether

the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims.

In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.

### (a) Failure to Request *Daubert* Hearing or Object to Testimony

Monterroso assigns that his trial counsel was ineffective for failing to request a *Daubert* hearing or renew counsel's objection to Dr. Sturgis' expert testimony during trial.

Prior to trial, Monterroso's counsel filed a motion in limine to exclude specific testimony of Dr. Sturgis. In the motion, counsel sought to prohibit the State from adducing

any evidence or testimony at trial from [Dr.] Sturgis or any other witness regarding supposed percentages or rates of children that make false allegations of sexual abuse, due to this being improper evidence under 27-701, 27-702, is bolstering, is indirectly commenting on their credibility, and the probative value is substantially outweighed by the danger of unfair prejudice under 27-403. The defense also asks the court to prohibit [Dr.] Sturgis or any other witness from explaining their definition of trauma and speculating whether the alleged victims have or will suffer trauma, discussing how sexual abuse could affect children later, what symptoms sexual abuse could cause later in life, or what the lasting consequences could be.

The court sustained the motion in part as it related to the percentages and overruled the remainder of the motion. Counsel did not make any further motions related to Dr. Sturgis' testimony or her qualifications. During the trial, Monterroso's counsel did not object to any of Dr. Sturgis' testimony, nor did he renew the objections raised in his motion in limine.

Dr. Sturgis testified that she was a licensed psychologist and involved with the "American Psychological Association; Nebraska Psychological Association; The American Professional Society on the Abuse of Children, APSAC; and Clinical Hypnosis Society; and . . . Professional Health Care Providers." Dr. Sturgis testified that she stayed current with the research and literature in the area of child sexual assault, including attending conferences and workshops, and that she is involved in training and consulting for child sexual assault for the Department of Health and Human Services workers. Dr. Sturgis' curriculum vitae and a list of her continuing education for the last 40 years was offered and received into evidence during the trial. Dr. Sturgis provided general testimony during the trial related to the rates of disclosure and nondisclosure in children, the definition of delayed disclosure and the reasons why it occurs, cultural differences in relation to

disclosure of abuse and sexual abuse, the definition of grooming, research related to adults making disclosure of abuse that occurred during their childhood, and difficulties in remembering specific instances of abuse.

Monterroso argues his counsel was ineffective in failing to challenge certain testimony from Dr. Sturgis on *Daubert* grounds. Specifically, he argues that Dr. Sturgis failed to establish the "methodology and the research she relied upon in testifying about [the following] subjects, and, from a *Daubert* standpoint, whether the research on which she relied and testified either has been or can be tested, or the methodology underlying her testimony." Brief for appellant at 33. As to the subjects he challenges, Monterroso argues:

> Dr. Sturgis testified at trial regarding a number of subjects, including why children don't tell about sexual assaults right away, including that they don't understand that what is happening is abusive[;] that they feel guilt, shame, or responsibility[;] that they fear not being believed[;] that it may disrupt the family[;] that they are sometimes afraid of retribution[;] and that they do not want to lose the relationship with the perpetrator. . . . She also testified, without objection, regarding cultural differences relating to delayed disclosure, specifically among Hispanic families. . . . She testified regarding why a child "would put up with sexual abuse for an extended period of time." . . . She testified regarding "grooming," and "the ways that perpetrators will groom the child." . . . She testified regarding why children "sometimes have difficulty saying exactly what abuse took place[.]"

Brief for appellant at 33.

Taken together, we read Monterroso's argument as claiming his counsel was ineffective for not objecting to Dr. Sturgis' testimony governing the subjects of delayed disclosure and grooming, because the methodologies or science governing these principles have not been generally accepted in the

medical community and should not have been presented to the jury. We disagree.

In *State v. McCurdy*, 25 Neb. App. 486, 908 N.W.2d 407 (2018), *affirmed on other grounds* 301 Neb. 343, 918 N.W.2d 292, Dr. Sturgis provided similar testimony regarding the subject of delayed disclosure. In reviewing the admissibility of this subject area, our court held:

> The primary purpose of Sturgis' testimony, as limited after McCurdy's pretrial motion in limine, was to provide the jury with background concerning child victims and how they differ from adult victims. The Nebraska Supreme Court has previously approved of the use of the type of testimony given by Sturgis. See, e.g., *State v. Fleming*, 280 Neb. 967, 792 N.W.2d 147 (2010). The court has noted that this type of evidence is helpful because ""'"[f]ew jurors have sufficient familiarity with child sexual abuse to understand the dynamics of a sexually abusive relationship," and "the behavior exhibited by sexually abused children is often contrary to what most adults would expect."'" *Id.* at 973, 792 N.W.2d at 154, quoting *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992).

*State v. McCurdy*, 25 Neb. App. at 500, 908 N.W.2d at 418.

Although our court analyzed the expert testimony in *McCurdy* as it related to the defendant's challenge that the testimony improperly bolstered the victim's credibility, we recognize the long line of authority in Nebraska allowing the use of this testimony over foundational challenges. See, *State v. Fleming*, 280 Neb. 967, 792 N.W.2d 147 (2010); *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992). Because we find that a challenge to the generally accepted scientific basis for this testimony would have been rejected, we find that the record is sufficient to consider this assignment of error on direct appeal and that Monterroso cannot establish prejudice thereon. The same can be said for Dr. Sturgis' generalized testimony regarding grooming behavior. See *State v. Greer*,

312 Neb. 351, 979 N.W.2d 101 (2022). Because we find that a *Daubert* challenge to Dr. Sturgis' generalized testimony on delayed disclosures and grooming on the basis of inadequate medical acceptance would have been rejected, we find Monterroso cannot establish prejudice and his challenges as to ineffective assistance on this basis fail.

### (b) Failure to Strike Juror

Monterroso argues that his counsel was ineffective for failing to request that the court strike a sleeping or inattentive juror.

Where the jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *State v. Huff*, 298 Neb. 522, 905 N.W.2d 59 (2017). The party seeking to discharge the juror has the burden to show that the juror was biased, engaged in misconduct, or was otherwise unable to continue to serve. See *id.*

During Investigator Hogan's testimony, the court stated to an unidentified person, "I'm going to stop you for just a minute. We need to — I think we have — if you are feeling a little sleepy, you are welcome to stand up so that you can stay awake." Later in the trial, the court directed counsel to approach and a sidebar commenced wherein the following colloquy ensued:

> THE COURT: I'm watching [a named juror] sleeping, but he is not paying attention the same way a lot of people do, that's clear, but he's tired. But I have my eyes on him.
>
> [The State:] Okay. Okay.
>
> THE COURT: You going rest? You want to do that right now in this fashion? Do you want to take a break because we probably have to talk to him?
>
> [Defense counsel:] I do want to take a short break.
>
> THE COURT: And you probably want to make a motion outside the presence —
>
> [Defense counsel:] Can I do that after [the State] rests?

THE COURT: Okay.

. . . .

THE COURT: Well, I think we're going to give them a 45 minute recess, and come back at three o'clock with them, but we'll do all of our stuff outside of their presence first, and then come back, you rest on the record, you can make the motion that you made outside the presence. I'll overrule it, and in all likelihood move forward.

Defense counsel did not object, move to strike, or make a motion for a mistrial.

The record here is not sufficient to determine why counsel decided not to request that the juror be stricken or failed to move for a mistrial. See *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017) (record insufficient to address claim that trial counsel failed to make record and either move for replacement of juror or move for mistrial when juror repeatedly slept through much of trial). Therefore, we conclude that this assignment of error cannot be adequately reviewed in this direct appeal.

(c) Failure to Object to Translated
Transcriptions of Controlled Call
and Postarrest Interview

Monterroso next assigns that his counsel was ineffective for failing to pose hearsay and confrontation objections to the translated transcriptions of the controlled call between Monterroso and N.M. and the interview between Investigator Hogan and Monterroso on the basis that the translator of those statements was not called to testify.

Prior to trial, the State made an oral motion to determine the admissibility of Monterroso's translated and transcribed statements made during a controlled call with N.M., a jail call between Monterroso and two witnesses, and Monterroso's postarrest interview with law enforcement. After the parties agreed that the entirety of the statements would be read into the record, defense counsel indicated he did not have an objection

assuming there was proper foundation laid for the exhibits. During the trial, defense counsel objected to the transcripts of the controlled call and his postarrest interview based on foundation and "inaudibles" in the transcripts.

Monterroso argues that his counsel's objections to the transcriptions offered and received were deficient because they failed to include objections on the basis of hearsay and the right to confrontation governing the translator of the transcriptions who was not called to testify. Instead, as we mentioned before, the State relied upon the investigator who reviewed the transcriptions and testified that they were accurately transcribed.

Monterroso acknowledges that

> [i]n [*State v.*] *Martinez*, [306 Neb. 516, 946 N.W.2d 445 (2020), *abrogated on other grounds*, *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023),] the Court stated that "where the translator of a defendant's out-of-court verbal or written statements from a foreign language to English is initially shown by the State to be qualified by knowledge, skill, experience, training, or education to perform such translation, and where the translator testified at trial and is subject to cross-examination, the translation is admissible as non-hearsay[.]" *Martinez*, 306 Neb. at 530.

Brief for appellant at 35-36. However, he argues the original translator's absence from trial negates that rule. We disagree.

Here, the State called Investigator Hogan at trial. Investigator Hogan testified that she was fluent in Spanish and English and that the translation was accurate. Further, because Investigator Hogan was subject to cross-examination, we find the State complied with the rule articulated in *Martinez*, thereby rendering the statements nonhearsay and not subject to a confrontation challenge. We further find that the record is sufficient to demonstrate that any objection by Monterroso's counsel on that basis would have been denied. This claim of ineffective assistance of counsel fails.

### (d) Failure to Object to Inclusion of Letter in PSR

Monterroso assigns that his trial counsel was ineffective in failing to object to the inclusion in the PSR of a letter from his former sister-in-law in which she indicated that she had also been a victim of Monterroso. He argues that those allegations were not presented as evidence during the trial, that his former sister-in-law does not satisfy the statutory definition of a victim, and that, although Neb. Rev. Stat. § 29-2261(3) (Supp. 2023) permits the inclusion of other information that probation deems relevant, the statute does not warrant the "unbounded inclusion of letters" which are "beyond the bounds of relevancy." Brief for appellant at 37.

However, in *State v. Gleaton*, 316 Neb. 114, 137-38, 3 N.W.3d 334, 351 (2024), the Nebraska Supreme Court rejected that same argument, stating, "[W]e have, on numerous occasions, rejected arguments that the Nebraska Crime Victim's Reparations Act prohibits a sentencing court from receiving information from individuals other than those specifically identified as victims in that statute." Additionally, the rights set forth in Neb. Rev. Stat. § 81-1848 (Cum. Supp. 2022) are baseline rights and do not limit a sentencing court's discretion to consider evidence from a variety of sources. *State v. Hurd*, 307 Neb. 393, 949 N.W.2d 339 (2020).

[26] Accordingly, we find that any objection made by trial counsel to the court's receipt of the letter would have been meritless. And, as a matter of law, counsel cannot be ineffective for failing to raise a meritless argument. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). Therefore, we reject Monterroso's assignment that his counsel was ineffective for failing to object to the letter's inclusion in the PSR.

### VI. CONCLUSION

Having rejected Monterroso's assigned errors, with the exception of any preserved claims for postconviction, we affirm Monterroso's convictions and sentences.

AFFIRMED.